365 F.2d 939
 AMERICAN AIRLINES, INC., et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Saturn Airways, Inc., World Airways, Inc., American Society of Travel Agents, Inc., Trans International Airlines, Inc., Modern Air Transport, Inc., American Flyers Airline Corporation, Johnson Flying Service, Inc., Purdue Aeronautics Corporation, Capitol Airways, Inc., and Overseas National Airways, Inc., Intervenors.
 No. 20159.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 14, 1966.
 Decided July 19, 1966.
 
 Mr. James F. Bell, Washington, D. C., with whom Mr. Brian C. Elmer, Washington, D. C., was on the brief, for petitioners. Mr. George C. Neal, Washington, D. C., also entered an appearance for petitioners.
 Mr. Warren L. Sharfman, Associate Gen. Counsel, Litigation and Legislation, C. A. B., with whom Asst. Atty. Gen. Donald F. Turner, Messrs. Joseph B. Goldman, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Atty., C. A. B., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondent.
 
 
 1
 Mr. Raymond J. Rasenberger, Washington, D. C., Atty. for intervenor Purdue Aeronautics Corp., and Clayton L. Burwell, Washington, D. C., Atty. for intervenor Trans International Airlines, Inc., argued on behalf of all intervenors.
 
 
 2
 Mr. Leonard Bebchick, Washington, D. C., was on the brief for intervenor Saturn Airways Inc.
 
 
 3
 Mr. Jerrold Scoutt, Jr., Washington, D. C., was on the brief for intervenor World Airways, Inc.
 
 
 4
 Mr. Ramsay D. Potts, Washington, D. C., was on the brief for intervenor American Flyers Airline, Inc.
 
 
 5
 Mr. Dayton M. Harrington, Washington, D. C., was on the brief for intervenor Capitol Airways, Inc.
 
 
 6
 Mr. Warren E. Miller, Washington, D. C., was on the brief for intervenor Johnson Flying Service, Inc.
 
 
 7
 Mr. Albert F. Beitel, Washington, D. C., was on the brief for intervenor Modern Air Transport, Inc.
 
 
 8
 Mr. Howard S. Boros, Washington, D. C., was on the brief for intervenor Overseas National Airways, Inc.
 
 
 9
 Mr. Charles A. Hobbs, Washington, D. C., was on the brief for intervenor American Society of Travel Agents, Inc.
 
 
 10
 Mr. Walter D. Hansen, Washington, D. C., also entered an appearance for intervenor Trans International Airlines, Inc.
 
 
 11
 Mr. Stephen D. Potts, Washington, D. C., also entered an appearance for intervenor American Flyers Airlines Corp.
 
 
 12
 Before DANAHER, Circuit Judge, BASTIAN, Senior Circuit Judge, and TAMM, Circuit Judge.
 
 TAMM, Circuit Judge:
 
 13
 This case presents essentially a question of statutory construction. It grows out of the protracted and absorbing battle over the years between the regularly scheduled airlines and the so-called "supplemental" airlines. The petitioners here comprise all but one of the domestic "trunkline" air carriers, plus Pan American World Airways. Their traditional role in air transportation has, of course, been to provide regularly scheduled air transportation service. The intervenors are "supplemental air carriers" who have also been known variously as "nonscheduled" and "large irregular" airlines.[1] Their traditional function has been limited to supplementing the scheduled airlines, principally through military and civilian charter service.
 
 
 14
 In 1962, Congress enacted Public Law 87-528 as an amendment to the Federal Aviation Act of 1958, 72 Stat. 731, as amended, 49 U.S.C. § 1301 et seq. These amendments authorized the Civil Aeronautics Boards (hereinafter the Board) to issue certificates of public convenience and necessity for "supplemental air transportation," statutorily defined simply as "charter trips in air transportation." Section 101(33) of the Federal Aviation Act of 1958, 72 Stat. 737, as amended, 75 Stat. 467, 76 Stat. 143, 49 U.S.C. § 1301. It is the uncertainty over the meaning of the term "charter trips" which prompts the necessity for interpretation of the statute, particularly as to whether such term embraces "inclusive tour charters." These inclusive tour charters are charters by supplementals to tour operators who, in turn, sell individual space on the chartered aircraft to the general public as part of an "inclusive tour."[2] In order for us to proceed to the actual interpretation of the statute, it is first necessary to briefly delineate the legislative history of the Act and the administrative interpretation which has been placed on the statute by the Board.
 
 
 15
 * Legislative History
 
 
 16
 Early in the 87th Congress, bills which had been prepared by the Board were introduced in both the Senate (S. 1969) and the House (H.R. 7318). Hearings were held in June 1961 before the Aviation Subcommittee of the Senate Committee on Commerce and the Subcommittee of the House Committee on Interstate and Foreign Commerce. Representatives of the Board, the supplemental air carriers, and the certificated air carriers appeared at these hearings.
 
 
 17
 On August 8, 1961, S. 1969 was reported out by the Senate Committee with committee amendments altering in part the original Board proposal. In its reported bill, the Senate Committee proposed that "charter service" should be defined to include authority for tour operators to charter planes from supplementals for the purpose of offering space to individual members of the general public as part of inclusive tours. Sen. Rep.No.688, 87th Cong., 1st Sess. 1 (1961), U.S.Code Cong. & Admin.News 1962, p. 1844.[3] In its Report, the Committee specifically noted that
 
 
 18
 "it is not the intention of the committee to permit individually ticketed service to be offered to the general public under the guise of charter. The proposed statutory definition, therefore, provides that charter shall not include such individually ticketed service whether offered by an air carrier directly or by a travel agent.
 
 
 19
 This restriction is subject to one exception because there is one circumstance in which a carrier or travel agent may offer the services to individual members of the public and still conform to the traditional concept of charter. This is in connection with an all-expense-paid group tour. If a travel agent charters an aircraft for an all-expense-paid tour and then offers to individual members of the public the right to participate as a member of the group, this is a very different sort of service from individually ticketed transportation." Sen.Rep.No. 688, 87th Cong., 1st Sess. 13-14 (1961). (Emphasis added.)
 
 
 20
 The amended administration bill passed the Senate on August 28, 1961.
 
 
 21
 Simultaneously with the Senate action, the House committee held hearings and reported out its bill. The House bill did not contain a definition of "charter service," leaving the term undefined, as it was in the then-existing statute. In its Report, the House committee explained its reason for not including a definition of charter service thusly:
 
 
 22
 "The supplementals recommended that a definition of charter be written into the bill and this was given consideration by your committee. The bill passed by the Senate has such a definition.
 
 
 23
 "Your Committee, however, after considering the problem came to the conclusion that under the circumstances, authority to define charter services should be left, as at present, with the Board, subject to the limitations contained in the reported bill. This is a very difficult subject and any effort to freeze a definition of charter service into law could well lead into complications. H.Rep.No.1177, 87th Cong., 1st Sess. 5 (1961). (Emphasis added.)
 
 
 24
 The House bill, as amended, was passed by the House on September 18, 1961.
 
 
 25
 With the bills thus at least potentially in conflict, the Senate and House conferees met to resolve their differences. The bill reported out by the conferees did not contain a definition of charter. The conference report to accompany the agreed-upon bill indicated that the conferees had adopted the House version on the issue in question, eliminating the definition of "charter service" originally contained in the Senate bill. This conference report, however, did not discuss the reasons why the House version was adopted over that proposed by the Senate.
 
 
 26
 Petitioners argue here that the Senate "receded" from its position on inclusive tours and that the bill as finally passed withheld from the Board any authority to authorize inclusive tours by supplementals through travel agents. Respondents and intervenor, on the other hand, argue that the "recession" by the Senate was only from the position that the Board should be required to grant inclusive tour charter authority to the supplementals (which would have been the effect of the original Senate formulation) to the position of the House, which, as explained in its Report, was that "authority to define charter services should be left, as at present, with the Board * * *"
 
 
 27
 In support of their argument, petitioners point to the statement of six members of the Congress in the legislative debates at the time of the passage of the final bill before both houses of the Congress. Representative of these statements, which will be considered in more detail, infra, is that of Senator Scott, a Senate manager of the bill. He stated, in pertinent part, that
 
 
 28
 "the committee of conference wisely eliminated the Senate provision. The bill thus, in effect, confirms the established law as to a charter in air transportation. There should be no question about that. The Congress has considered, and rejected, a proposal to change the established meaning of charter so as to have permitted travel agent charters for all-expense tours. Such charters have no place in air transportation. This being the thrust of the congressional action, it would be clearly improper if the Civil Aeronautics Board were hereafter to undertake to rewrite the law and to authorize under guise of charter, all-expense-tour operations * * *." 108 Cong.Rec.12284-85 (1962).
 
 
 29
 The question thus clearly proposed for our determination is whether the Federal Aviation Act of 1958, as amended, limits the Board's power to authorize inclusive tour charters. Before resolving this question, some assistance in making our determination may be forthcoming from a consideration of the Board's resolution of the issue.[4]
 
 II
 Administrative Interpretation
 
 30
 In analyzing this question, the Board framed the issue in the following language:
 
 
 31
 "Under the definition of supplemental air transportation in section 101(33) of the Act, we may authorize supplemental air carriers to engage solely in `charter trips.' The argument is made that the term `charter trip' does not include charters to tour operators acting as indirect air carriers for the purpose of transporting inclusive tour groups whose members are gathered from the general public, and that charters would be mere subterfuges for individually ticketed transportation. The argument is based primarily on the claim that, while the statute does not spell out a prohibition against inclusive tour charters, its legislative history expresses such an intention. The examiner correctly rejected this argument."[5]
 
 
 32
 In resolving the issue, the Board relied primarily upon two propositions: first, that the legislative history of the Amendment demonstrated that the definition of charter was to be left to the Board; and second, that this court's decision in American Airlines, Inc., et al. v. C. A. B., 121 U.S.App.D.C. 120, 348 F.2d 349, 354 (1965) clearly demonstrates that the question of definition of charter was to be left to the Board. The Board found additional analogical support for its interpretation in precedent and practice in the field of surface transportation, where the legality of inclusive tour charters has long been settled "as against contentions that they are mere subterfuges for individually ticketed transportation."[6]
 
 
 33
 The Board interpreted the previously delineated sequence of legislative events as clearly indicating that the definition of charter was to remain a function of the Board. It relied heavily upon the House committee report which specifically stated that "authority to define charter services should be left, as at present, with the Board, * * *" H.Rep.No. 1177, 87th Cong., 1st Sess. 11 (1961). Finding the meaning of the statute to be clear, especially as reinforced by the sequence of events in the Senate and the House and the authoritative committee reports explaining these events, the Board did not believe that there was any "sound reason for attempting to analyze the statements made at the time of the passage of the bill by certain of its floor managers."[7]
 
 
 34
 In the 1965 American Airlines case cited by the Board (known as the Transatlantic case), this court also had occasion to interpret the meaning of the term "charter trips" as used in the 1962 amendments to the 1958 Federal Aviation Act. The specific question presented in that case was whether the Board had the power under the statute to authorize supplemental carriers to charter space to two groups on one aircraft, id est, "split charters." The same petitioners in the present case attacked split-chartering there on the ground that the legislative history of the Act demonstrated the Congress intended that the Board should have no authority to authorize supplemental carriers to charter aircraft for "split charters."
 
 
 35
 This court rejected the argument of the scheduled airlines stating:
 
 
 36
 "We are unable to conclude that the term charter trips has a fixed meaning * * *. We conclude Congress intended, although not without limits, that the Board should be free to evolve a definition in relation to such variable factors as changing needs * * * We agree with the Board that the legislative history reveals that a prime concern of Congress was to maintain the integrity of the charter concept — to preserve the distinction between group and individually ticketed travel; within these limits it is for the Board to evolve reasonable definitions." 348 F.2d at 354.
 
 
 37
 The Board summed up its analysis of the legislative history by concluding that:
 
 
 38
 "Considering all of the foregoing, we are persuaded that we have the power to authorize inclusive tour charters as `charter trips' under section 101(33) provided that we preserve the basic distinction between group and individual travel." Board Order E-23350 (March 11, 1960).
 
 Judicial Interpretation
 
 39
 The question which this Court must decide is brought into bold relief against the background heretofore sketched: Given the fact that the term charter trip is not defined in the Act itself, and the further fact that the Board had preexisting authority to determine the definition of charter, does the legislative history of the Amendments indicate that Congress intended the Board to continue to have this power (such intention being expressed principally in the House committee report), or does the legislative history demonstrate that Congress intended to withdraw such authority from the Board (such intention being expressed in the debates on the floors of the houses of Congress)? Although the question could be more simply stated as whether a clearly demonstrated intention contained in a committee report takes precedence over a clearly demonstrated contrary intention in the floor debates, we do not believe the question to be quite so narrow. The overall policy and purpose of the Act and the demonstrated understanding of the Congressmen as to the meaning of the points in issue must also be taken into account in finally resolving the question. Based upon our analysis of the legislative history and overall policy and purpose of the legislation, we conclude that the Congress did not intend to withdraw this authority from the Board and that the Board's decision in the instant case must therefore be affirmed.
 
 
 40
 We look first to the Congressional declarations as to the purposes of the Act. Perhaps the most succinct statement concerning the purpose of the legislation was that made by Senator Monroney, who was chairman of the Senate Subcommittee which held hearings on the legislation, and the Senate floor manager of the bill. He stated:
 
 
 41
 "Mr. President, this is a very complicated and difficult piece of legislation * * * It seeks to provide a permanent place in the aviation industry for supplemental air carriers without adverse effect upon scheduled carriers * * *." 107 Cong.Rec. 17162 (Aug. 28, 1961).
 
 
 42
 An overall reading of the legislative history indicates that the three primary purposes of the 1962 legislation were: to eliminate irresponsible supplementals, especially those violating safety regulations; to stabilize the operating authority of the supplementals under certificates, including authority to authorize "charter trips" on a broad enough basis so that through performance of civilian and military charter operations the supplementals might remain viable economic organizations capable of meeting supplemental transportation needs and able to comply fully with safety requirements; to maintain the regulatory scheme of the Federal Aviation Act and the protection of the certificated carriers such as petitioners by eliminating unregulated individually ticketed point-to-point competition from the supplementals.[8]
 
 
 43
 Apparently the all-consuming question with respect to the authorization of inclusive tour charters was whether allowance of such would violate the third purpose of the Act, id est, the prevention of individually ticketed point-to-point competition to the scheduled airlines by the supplementals. This fear arose partly out of the fact that supplementals had previously been allowed to perform scheduled individually ticketed travel not to exceed ten trips per month between any two points in the United States. Pooling operations between various supplementals caused abuses to grow up in the utilization of this authority. Groups of carriers would combine their operations and provide daily services claiming at least color of authority under the ten-flight per month authorization. The problem created by the pooling operations was highlighted in the Senate and House Committee Reports. For example, in the House Report it was noted that
 
 
 44
 "the de facto pooling of operating authorizations followed by protracted judicial proceedings before the operations could be curtailed had created a serious regulatory problem which the supplemental carrier legislation was designed to eliminate." H.Rep. No. 1177, 87th Cong., 1st Sess. 13 (1961). See also Senate Rep.No. 688, 87th Cong., 1st Sess. 16, et seq. (1961).
 
 
 45
 The scheduled airlines were naturally alarmed that the supplementals were diverting passenger traffic. The ten-trip per month individually ticketed authority was withdrawn from the supplementals as a result of the 1962 legislation. The supplementals were relegated as a result of the legislation to the performance of civilian and military charter service.
 
 
 46
 It is thus apparent that the concern over individually ticketed authority was essentially a product of the supplementals' previous authority to perform individually ticketed travel not to exceed ten trips per month between any two points in the United States. This authority was completely independent of any charter definition.[9] The question of inclusive tours was, however, a definite part of the question of charter definition. Analysis of the statements of the floor managers in the debates indicates that they were fearful that the same abuses which had grown up through utilization of the individually-ticketed-travel-not-to-exceed-ten-trips-per-month authority would come about as a result of the inclusive tour authorization. For example, Senator Cotton stated that:
 
 
 47
 "the elimination from the bill of the general Senate language defining charter service should not, however, in my view, be construed as giving the Board any kind of carte blanche with respect to long-established principles of law relating to charters. The Civil Aeronautics Board has, in the past, rejected proposals to water down the safeguards against the abuse of charter service, and I hope the Board will continue to be firm in this respect. The Board has a serious obligation to see that charter services do not become individually ticketed services through subterfuge or abuse." 108 Cong.Rec. 12284 (June 29, 1962). (Emphasis added.)
 
 Senator Thurmond stated:
 
 48
 "I am advised that the CAB Bureau of Economics has advocated that a so-called all-expense tour concept be grafted onto the existing charter definition. This would be intolerable, and has been expressly rejected by the conferees. The Senate receded from its charter definition which included this all-expense tour provision.
 
 
 49
 * * * * *
 
 
 50
 "Air transportation has suffered from the abuses of individually ticketed operations. The law violations in this area have all too frequently extended to infractions of safety provisions as well. It is for this reason that I want to emphasize the insistence of Congress that supplemental charter operations shall be confined to full plane load charter operations exclusively." Id. at 12285.
 
 
 51
 Representatives Harris and Collier submitted identical statements to the effect that
 
 
 52
 "the law is well established that, in air transportation, charter means essentially the lease of the entire capacity of an aircraft for a period of time or a particular trip, for the transportation of cargo or persons and baggage, on a basis which does not include solicitation of the general public or any device where individually ticketed services would be offered or performed under guise of charter." Id. at 1232-24. (Emphasis added.)
 
 
 53
 The primary fear of the legislators was that supplementals would divert traffic from the scheduled airlines through utilization of individual ticketed authority. However, this evil was known to the legislators only through the abuses which grew out of the ten-trip-per-month authority. Prior to 1962 the Board had never authorized inclusive tour authority for the supplementals. Thus it is apparent that the apprehensions of the legislators did not grow out of any experience with inclusive tour charters, but rather was a projected fear based upon the unhappy experience with the ten-trip-per-month authority.
 
 
 54
 The question therefore arises as to whether authorization of inclusive tour charters will in fact bring about the individually ticketed abuses experienced under the ten-trip-per-month authority. The Board found that such abuses would not ensue. In order to insure that the supplementals were properly regulated in this respect, and to insure that the individual ticketing abuses would not occur, the Board issued stringent regulations at the time of its decision in the instant case to cover inclusive tour charters.[10] The key to this case, we believe, is the fact that the Congress at the time it passed the legislation had no way of knowing specifically how the Board would regulate the actions of the supplementals with respect to inclusive tour charters. Based upon the then past experience, a reasonable fear of the legislators was that inclusive tour charters might be abused in the manner that the ten-trip-per-month authority had been abused so as to make incursions into the scheduled airlines' passenger services. Lacking specific knowledge of the Board's regulations, the legislators logically relied upon past experience. This analysis is supported by reference to the legislative history. For example, Senator Scott stated:
 
 
 55
 "Another essential element is that the person who charters an airplane cannot resell the space to individuals or solicit the general public to buy space. This is necessary to prevent breakdown of the regulatory system, and most particularly the rate regulatory system. If this were not one of the rules, a travel agent could charter an airplane, and then offer the seats to the general public at less per head than the tariff fares the airplane must observe as to each passenger." 103 Cong.Rec. 122284 (June 29, 1962).
 
 
 56
 The fears of Senator Scott that the regulatory system will be disrupted and that the travel agents will be able to sell seats to the general public at less per head than the price charged by the scheduled airlines are met and answered by the Board's regulation. The regulations specifically require that the tour price charged by the agent can be no lower than 110% of the lowest available fare (including stopover charges) offered by the scheduled route carriers "for individually ticketed service on the circle route beginning at the point of origin, to the various points where stopovers are made, and return to the point of origin." It is apparent, therefore, that under the Board's regulations the inclusive tour charge will always be at least 10% higher than the price of the lowest available fare offered by the competing scheduled airlines for comparable transportation.
 
 
 57
 We believe that an analysis of the regulations will demonstrate even further that the Board has effectively precluded the possibility that the fears apprehended by the legislators will in fact be realized. In addition to the 110% of the lowest fare requirement already referenced, the regulations require: that each inclusive tour make a minimum of three stops (not including the point of origin), each stop to be not less than fifty air miles apart; that a "minimum of seven days must elapse between departure and return"; that every tour operation must be performed on a round-trip basis; that the tour price shall include, at a minimum, all hotel accommodations and necessary air or surface transportation between all places on the itinerary, including transportation to and from air and surface terminals utilized at such places other than the point of origin; that every tour must be operated by a regulated tour operator who charters aircraft for such tours from a certified supplemental air carrier.
 
 
 58
 In addition to these stringent requirements, the Board's regulations require: that prior approval of the tour proposal must be obtained from the Board by the tour operator and the supplemental air carrier; that the prospective tour operators file a statement containing a detailed picture of their experience, business structure, and financial condition. The tour operator's application must include, among other data: a statement of the tour operator's qualifications; the time and dates of the flights; the type of aircraft; a detailed statement of the tour itinerary, including such things as the name of the hotels, length of stay, etc.; the tour price; the number of persons expected to participate; the charter price of the aircraft; and samples of the solicitation material to be used to promote the tours. Each application must be verified by the supplemental carrier and tour operator and filed 90 days in advance of the operation. Each application must be served on each direct air carrier serving the points involved in the tour operation and such direct air carriers may object to such tours within ten days thereafter. The sale of tour charters by supplementals is restricted to tour operators granted indirect air carrier authority by the Board pursuant to the Board's regulations, which authority may be suspended by the Board without a hearing. No supplemental air carrier may perform any tour charter trips unless it has on file with the Board a currently effective charter tariff showing all rates, fares and charges. All tour operators operating inclusive tour charters must furnish a surety bond in the amount of at least twice the charter price. The Board's regulations contain certain requirements pertaining to the contract between the supplemental air carrier and the tour operator, and the contract between the tour operator and the tour participant. The supplemental carrier and the tour operator must make a post-tour report to the Board.
 
 
 59
 In addition to these stringent restrictions on the supplementals and the tour operators, the Board limited its inclusive tour authorization to a test period of five years and indicated that it would then "review the tour program to determine if it fulfilled its promise." In the interim, the Board noted that experience might show need for modification either "to prevent undue diversion" or to "relax restrictions that may prove too onerous," and noted that its "rule-making powers" would permit it to deal with such situations as they arose. Finally, in summing up its reasons for adopting the inclusive tour charter operation the Board noted:
 
 
 60
 "The use of the charter mechanism, combined with the restrictions which we are imposing by regulation, necessarily results in a service to the public which is different in significant respects from that available on scheduled services. In exchange for realizing the price savings accruing from the economies of plane-load charter operations, the charter tour passenger is subjected to the rigidities of a group itinerary, must be willing to travel and share facilities with strangers, and must agree to the necessary regimentation that is entailed in group travel. Nor will he have the freedom to select from the multiple daily schedules offered by route carriers, but will be confined to predetermined departure and arrival times selected by the tour operator. Moreover, it is clear that the specially tailored type of service to be provided is not one which could practicably be furnished by route carriers on their scheduled operations." Board Order E-23350 (March 11, 1966).
 
 
 61
 The foregoing analysis of the Board's regulations and its reasons for adopting them provide, we believe, a reasonable basis for a conclusion that the individual-ticketing problems foreseen by the legislators will be precluded. We do not find in the Board's action any arbitrary exercise of its powers, and we believe that its conclusions are supported by substantial evidence on the record as a whole. Moreover, the Board found, in the exercise of its administrative expertise, that a significant amount of the revenues of the supplemental carriers earned through inclusive tour charters would be newly generated traffic, rather than traffic diverted from existing services, and that in the long run this will tend to broaden the base for air transportation and ultimately inure to the benefit of the entire air transportation industry, including the scheduled airlines.[11] The promotion by the Board of this salutary result is hardly assailable as an arbitrary exercise of its power. In addition, the Board found that the authorization of inclusive tour charters would give the supplementals a new lease on their economic life by helping them to generate more civilian traffic. The principal revenues of supplementals (over 70%) arise from military charters. The Department of Defense now requires that carriers receiving contracts secure "at least 30% of their air transportation revenues during 1966 from commercial sources." The effect of this requirement is that increased civilian business is essential to the maintenance or increase of the vital military charter business. This increase in revenues is also critical to the financial well-being of the supplementals.
 
 
 62
 We believe that, if the statements of the floor managers are considered in the light of the foregoing analysis, and sight is not lost of the fact that the legislators did not in fact have the Board's regulations before them when the Act was passed, the Board's interpretation of its statutory power comports with the overall statutory intention of Congress. Although specific conflict does exist to some degree between the statements on the floors of the houses, and the Act itself and the House committee report, much of that conflict is dissipated by the above analysis of the evil apprehended by the legislators and the measures adopted by the Board to prevent its occurrence. Any remaining conflict must give way to the generally accepted maxim of statutory construction that reports by the legislative committees responsible for formulating the legislation must take precedence in event of conflict over statements in the legislative debates on the floors of the houses of Congress. See United States v. International Union United Auto, etc., Workers, 352 U.S. 567, 585 (1950); Nicholas v. Denver & R. G. W. R. Co., 195 F.2d 428 (10th Cir. 1952); Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474, 41 S.Ct. 172, 65 L.Ed. 349 (1920).
 
 
 63
 Finally, our decision here is in conformity with Judge Burger's well-reasoned opinion in the American Airlines case. We believe with Judge Burger that:
 
 
 64
 "We are unable to conclude that the term charter trips has a fixed meaning or that Congress intended to restrict the Board to a definition of one aircraft — one charter. We conclude that Congress intended, although not without limits, that the Board should be free to evolve a definition in relation to such variable factors as changing needs and changing aircraft; * * * We agree with the Board that the legislative history reveals that a prime concern of Congress was to maintain integrity of the charter concept — to preserve the distinction between group and individually ticketed travel; within these limits it is for the Board to evolve reasonable definitions." 348 F. 2d at 354.
 
 The order of the Board must therefore be
 
 65
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The American Society of Travel Agents has also intervened in these proceedings for reasons which will become apparent,infra.
 
 
 [2]
 The term "inclusive tour" is generally synonymous with an "all-expense tour." The Board has adopted the term "inclusive tour" rather than "all-expense tour" because all expenses are not necessarily required to be included in the tour price. We will adopt the Board's terminology in this case
 
 
 [3]
 "(13). `Charter service' means air transportation performed by an air carrier holding a certificate of public convenience and necessity where the entire capacity of one or more aircraft has been engaged for the movement of persons and their baggage or for the movement of property on a time, mileage, or trip basis,but shall not include transportation services offered by an air carrier under an arrangement with any person who provides or offers to provide transportation services to individual members of the general public, other than as a member of a group on an all-expense-paid tour." (Emphasis added.)
 
 
 [4]
 Although we have primary jurisdiction to interpret the enabling and regulating statutes of administrative agencies, the interpretation placed upon its enabling or regulating statute by the agency itself is not without some weight in the final resolution of such interpretation questions
 
 
 [5]
 Board Order E-23350 (March 11, 1966)
 
 
 [6]
 Board Order E-23350 (March 11, 1966)
 
 
 [7]
 Board Order E-23350 (March 11, 1966)
 
 
 [8]
 See,e. g., S.Rep. No. 688, 87th Cong., 1st Sess. 21 (1961); H.Rep. No. 1177, 87th Cong., 1st Sess. 6 (1961); 107 Cong.Rec. 20081 (Sept. 18, 1961 — statement of Rep. Harris); Hearings before Subcommittee of Commerce Committee on H.R. 7512, and H.R. 7675, 87th Cong., 1st Sess., 13, 29, 74, 91, 156, 218-19; Hearings before the Aviation Subcommittee of Commerce Committee on S. 1969, 87th Cong., 1st Sess., 268, 270, 281, 282-83.
 
 
 [9]
 Sen.Rep. No. 688, 87th Cong., 1st Sess. 11-15 (1961)
 
 
 [10]
 C.A.B. Special Regulations, Part 378
 
 
 [11]
 The hearing examiner found (affirmed by the Board), that inclusive tour charters had been utilized in England and that the British experience has demonstrated that there is no serious diversion from the scheduled airlines. He quoted an advisor to a scheduled airlines as follows:
 "For the most part these were passengers who would not have travelled by air on normal scheduled services. They were persuaded to fly by the attractive prices and great convenience of the packaged holidays offered. The real importance of inclusive tour services to British civil aviation lies in the fact that a very large number of people have been converted into air travellers through the promotional efforts of the organizers of air tours. In this way, the financial and social boundaries of the air travel market have been greatly extended."