WORLD AIRWAYS, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

City of Oakland, California Board of Port Commissioners et al., Intervenors.

No. 76–1072.

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 1976.

Decided Dec. 8, 1976.

---

Jerrold Scoutt, Jr., Washington, D. C., with whom Frank J. Costello, Washington, D. C., was on the brief, for petitioner.

Robert L. Toomey, Atty., Civ. Aeronautics Bd., Washington, D. C., with whom James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, and Glen M. Bendixsen, Associate Gen. Counsel, Civ. Aeronautics Bd., Washington, D. C., were on the brief, for respondent.

Ky P. Ewing, Jr., with whom Alfred V. J. Prather, Washington, D. C., was on the brief, for intervenors American Airlines, Inc., and Trans World Airlines, Inc.

J. Kerwin Rooney, Oakland, Cal., Cecil A. Beasley, Jr., and John C. Smuck, Washington, D. C., were on the brief, for intervenors City of Oakland, California, Board of Port Commissioners and The Oakland Chamber of Commerce.

James M. Verner and Ronald B. Natalie, Washington, D. C., , were on the brief, for intervenor Northwest Airlines, Inc.

Arnold T. Aikens and Michael A. Katz, Washington, D. C., were on the brief for intervenor, United Air Lines, Inc.

Jerry W. Ryan and Susan A. Elliott, New York City, were on the brief for intervenors Eastern Air Lines, Inc., National Airlines, Inc., Pan American World Airways, Inc., and Western Air Lines, Inc.

Before McGOWAN, ROBINSON, and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

The sole issue in this case is whether the 1962 amendments to the Federal Aviation Act of 1958, Pub.L. No. 87–528, 76 Stat. 143, should be construed to bar the Civil Aeronautics Board from issuing a certificate for scheduled route authority to an air carrier holding a certificate for supplemental air transportation. The Board has so read the statute. We find such a reading unwarranted, and therefore hold that the Board should have addressed the merits of an application for such authority.

I

On April 2, 1975 petitioner World Airways, Inc., an air carrier certificated to engage in supplemental service within the United States and between the United States and all foreign points except those in Canada and Mexico, filed an application with the Board seeking certification to perform regularly scheduled trans-continental service between Newark and Baltimore on the East Coast and Ontario and Oakland, California on the West. World contemplated a high-density, high-load factor service utilizing "satellite" airports, with a one-way fare of eighty-nine dollars per person. However, World indicated that it would not be willing to surrender its supplemental certificates if granted scheduled route authority. On January 23, 1976 the Board dismissed World's application without reaching the merits, holding that the 1962 amendments preclude issuance of a certificate for scheduled authority to a carrier holding a supplemental certificate. Docket 27693, Order 76–1–88 (Jan. 23, 1976).

Sections 401(d)(1) and (2) of the Federal Aviation Act, as amended, govern the certification of scheduled route authority, that is, authority to provide conventional individually ticketed service. These sections provide that an applicant must be "fit, willing, and able," and that the requested service must be "required by the public convenience and necessity." [1] However, the only express limitation on who may apply for scheduled route authority is contained in section 401(a), which confines eligibility to "air carriers," defined as "citizens of the United States" within the meaning of section 101(13) of the Act, 49 U.S.C. § 1301(13) (1970). See 49 U.S.C. §§ 1301(3), 1371(a) (1970).

The 1962 amendments to the Act added a provision authorizing certification for supplemental air transportation, defined to encompass charter service but not individually ticketed authority. See 49 U.S.C. § 1301(36) (1970).[2] This provision, section

---

1. Section 401(d)(1) controls the award of permanent authority, while 401(d)(2) governs temporary certification. These sections provide in full:

   (d)(1) The Board shall issue a certificate authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation is required by the public convenience and necessity; otherwise such application shall be denied.
   (2) In the case of an application for a certificate to engage in temporary air transportation, the Board may issue a certificate authorizing the whole or any part thereof for such limited periods as may be required by the public convenience and necessity, if it finds

   that the applicant is fit, willing, and able properly to perform such transportation and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder.
   49 U.S.C. § 1371(d)(1), (2) (1970).

2. Considerable litigation has taken place with regard to the definition of "charter trips." See, e. g., Saturn Airways, Inc. v. CAB, 157 U.S. App.D.C. 281, 483 F.2d 1284 (1973); Pan American World Airways, Inc. v. CAB, 380 F.2d 770 (2d Cir. 1967), aff'd by an equally divided Court, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968); American Airlines, Inc. v. CAB, 125 U.S.App.D.C. 6, 365 F.2d 939 (1966); American Airlines, Inc. v. CAB, 121 U.S.App.D.C. 120, 348 F.2d 349 (1965). The overriding principle that has emerged from these cases is that the Board "should never permit 'individually ticketed service to be offered to the general public under the guise of charter.' Sen.Rep. No. 688,

401(d)(3) of the Act, includes the requirements that the applicant be "fit, willing, and able" and that the certificated service be "required by the public convenience and necessity," but also includes a limitation—above and beyond section 401(a)—on who is eligible for supplemental certification: the applicant must not be "holding a certificate under paragraph (1) or (2) of this subsection [section 401(d)]." [3] In other words, an air carrier holding scheduled route authority under section 401(d)(1) or (2) is barred from obtaining supplemental authority under 401(d)(3). However, section 401(d)(3) does *not* by its terms forbid a supplemental carrier from acquiring scheduled authority. The issue in this case thus becomes whether the general purposes of the 1962 amendments would be furthered by reading this converse limitation into the Act.

## II

■ At the outset, it is important to note the narrowness of the question before us. We are asked merely to decide whether the Board is statutorily foreclosed from considering a supplemental carrier's application for scheduled authority. The absence of a statutory bar does not mean, of course, that a supplemental carrier is entitled to scheduled authority. It does mean that its application for such authority is to be evaluated on its merits, with due consideration to be given to all relevant aspects of the public interest, including the applicant's responsibilities as a supplemental carrier.

■ A central objective of the Federal Aviation Act is to promote regulated competition in the air transportation industry.

See, e. g., 49 U.S.C. § 1302 (1970) (public interest standard under the Federal Aviation Act); *Continental Air Lines, Inc. v. CAB*, 171 U.S.App.D.C. 295, 519 F.2d 944, 951–55 (1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 365 (1976). The primary means for achieving this goal is the certification process, in which the Board must consider whether the applicant is "fit, willing, and able" and whether the requested authority would serve the "public convenience and necessity." Consequently, rigid constraints on the Board's ability to consider applications on their merits are generally disfavored. *See, e. g., Civil Aeronautics Board v. State Airlines, Inc.*, 338 U.S. 572, 576–78, 70 S.Ct. 379, 94 L.Ed. 353 (1950).

■ Against this background, persuasive evidence would be required to establish that the 1962 amendments were intended to preclude Board consideration of applications from an entire class of potential entrants into the market for scheduled service. Our skepticism in this regard is reinforced by the total absence of such a restriction in the express provisions of the legislation. Nevertheless, the Board concluded that the 1962 amendments do not allow "an air carrier to simultaneously hold certificates for regular route and supplemental air transportation," even if the route authority is acquired subsequent to the supplemental authority. Docket 27693, *supra*, at 4. Allowing a supplemental carrier to obtain scheduled authority would, so the Board asserted, produce arbitrary and unreasonable results under several provisions of the amendments. Moreover, the Board stated

87th Cong., 1st Sess. 13 (1961)." *Saturn Airways, supra* at 1288. It should be noted, however, that supplemental air carriers do have the right to seek *temporary* individually ticketed route authority under section 417 of the Act. *See* p. 14 & n.10 *infra*.

**3.** Section 401(d)(3) provides in full:
(d)(3) In the case of an application for a certificate to engage in supplemental air transportation, the Board may issue a certificate, to any applicant not holding a certificate under paragraph (1) or (2) of this subsection, authorizing the whole or any part thereof, and for such periods, as may be

required by the public convenience and necessity, if it finds that the applicant is fit, willing, and able properly to perform the transportation covered by the application and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder. Any certificate issued pursuant to this paragraph shall contain such limitations as the Board shall find necessary to assure that the service rendered pursuant thereto will be limited to supplemental air transportation as defined in this chapter.
49 U.S.C. § 1371(d)(3) (1970).

that the "plain implication" of the 1962 legislation, as well as the thrust of its legislative history, is that Congress intended to create two mutually exclusive classes of carriers, one to engage only in regular air transportation[4] and the other to supply only supplemental service.[5]

Although it is clear that Congress intended to authorize certification of a class of air carriers engaging in supplemental service, we do not see any convincing evidence that Congress intended members of this class to be foreclosed from seeking regular route authority. This court's decisions in *American Airlines, Inc. v. CAB*, 98 U.S.App.D.C. 348, 235 F.2d 845 (1956), *cert. denied*, 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957), and *United Air Lines, Inc. v. CAB*, 108 U.S.App.D.C. 1, 278 F.2d 446, *vacated*, 364 U.S. 297, 81 S.Ct. 267, 5 L.Ed.2d 89 (1960), had cast doubt on the Board's power to certify supplemental service under the statutory scheme in effect prior to the 1962 amendments. In *American Airlines*, we rejected the Board's attempt to grant supplemental air carriers unlimited charter authority, plus authority to offer up to ten individually ticketed flights on any given route per month, through conferral of an exemption from the provisions of the Federal Aviation Act. In *United Air Lines*, we

denied the Board's efforts to achieve a similar result through the certification process. The 1962 legislation established a statutory basis for certification and regulation of supplemental service, while preserving the basic structure of the Act and protecting carriers holding certificates for regularly scheduled air service from unregulated competition. As this court concluded in *American Airlines, Inc. v. CAB*, 125 U.S. App.D.C. 6, 365 F.2d 939 (1966):

> An overall reading of the legislative history indicates that the three primary purposes of the 1962 legislation were: to eliminate irresponsible supplementals, especially those violating safety regulations; to stabilize the operating authority of the supplementals under certificates, including authority to authorize "charter trips" on a broad enough basis so that through performance of civilian and military charter operations the supplementals might remain viable economic organizations capable of meeting supplemental transportation needs and able to comply fully with safety requirements; *to maintain the regulatory scheme of the Federal Aviation Act* and the protection of the certificated carriers such as petitioners by eliminating *unregulated* individually ticketed point-to-point competition from the supplementals.

4. It should be noted that regular carriers, that is, carriers holding scheduled route authority under section 401(d)(1) or (2), may perform charter trips and special services under regulations prescribed by the Board. *See* Federal Aviation Act of 1958, § 401(e)(6), *as amended*, 49 U.S.C. § 1371(e)(6) (1970), *reprinted* in note 6 *infra*. Current regulations permit an unlimited number of "on-route" charter flights, but restrict the frequency and regularity of "off-route" charters. *See* 14 C.F.R. Part 207 (1976). The Board presumably recognizes the "hybrid" character of the service provided by regular carriers but argues, in essence, that applicants must choose between the package of authority comprehended by scheduled route certification and the package of authority offered by supplemental certification.

5. The Board also gave weight to the fact that prior to the 1962 legislation its policy was to prohibit an air carrier from simultaneously holding both route and supplemental authority. The Board reasoned that "[p]rior administrative policy and practice represents another ac-

cepted source of guidance in determining how statutes should be construed and applied." Docket 27693, *supra*, at 7. With all respect, we do not find the Board's pre-1962 interpretation of the Act persuasive support for its reading of the 1962 amendments. It seems reasonable to suppose that a policy formulated at the time the Board was attempting to justify an exemption of supplemental carriers from the provisions of the Act would not survive the establishment of a clear statutory basis for awarding supplemental certificates. Certainly Congress did not think the prior Board policy was incorporated as such in the 1962 amendments: the express prohibition in section 401(d)(3) against acquisition of supplemental authority by a regular carrier would not have been necessary had Congress thought the Board's policy against dual certification was being carried forward by the legislation. We note, moreover, that until the instant litigation the Board had not formally determined the effect of the 1962 amendments upon its prior policy.

*Id.* at 944–45 (footnote omitted) (emphasis supplied). *See also Pan American World Airways, Inc. v. CAB*, 380 F.2d 770, 777 (2d Cir. 1967), *affirmed by an equally divided Court*, 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968). Obviously, a congressional desire to establish authority for supplemental service and protect regular air carriers against unregulated competition from the supplementals does not necessarily imply a congressional purpose to shield regular carriers against competition from supplemental carriers which is deemed to be in the public interest after a full hearing by the Board.

We do not think the Board's construction of the amendments is necessary to avoid arbitrary or unreasonable results. Nor do we find sufficient support for its position in the legislative history, or in the language of the 1962 provisions considered in their complete context. The Board cited three sections which deny benefits or impose additional requirements on "supplemental air carriers," and found an anomaly in the fact that a carrier holding both route and supplemental authority would be, at one and the same time, "covered and not covered" by these sections.[6] The intervening Oakland parties (the City of Oakland,

**6.** In the words of the Board:

. . . Section 401(e)(6) of the Act had authorized those carriers holding certificates issued under Section 401(d)(1) or (2) to engage in charter trips and special services without regard to the points named in their certificates. The 1962 supplemental air carrier legislation amended this section to deny supplemental air carriers this authority. Section 401(n) of the Act either authorizes, or imposes, a number of special requirements relating to supplemental air carriers that are not applicable to route carriers. These include provisions relating to insurance, minimum service, and "continuing fitness." Section 406(b) had authorized the payment of subsidy for all carriers. That section was also amended by the 1962 supplemental legislation to preclude subsidy for supplemental air carriers. If World were to receive a certificate under Section 401(d)(1) or (2) and at the same time was permitted to retain its supplemental certificate, it would still be a supplemental carrier by definition. The wholly anomalous result would be that the carrier would at one and the same time be (a) granted and denied Section 401(e)(6) authority; (b) subject to and not subject to Section 401(n) requirements; and (c) eligible and not eligible for subsidy.

Docket 27693, *supra*, at 6.

Section 401(e)(6), as amended, provides:

(6) Any air carrier, *other than a supplemental air carrier,* may perform charter trips (including inclusive tour charter trips) or any other special service, without regard to the points named in its certificate, or the type of service provided therein, under regulations prescribed by the Board.

49 U.S.C. § 1371(e)(6) (1970) (emphasis added).

Section 401(n) provides in relevant part:

(n)(1) No certificate to engage in supplemental air transportation, and no special operating authorization described in section 1387 of this title, shall be issued or remain in effect unless the applicant for such certificate or the *supplemental air carrier,* as the case may be, complies with regulations or orders issued by the Board governing the filing and approval of policies of insurance, in the amount prescribed by the Board, conditioned to pay, within the amount of such insurance, amounts for which such applicant or such *supplemental air carrier* may become liable for bodily injuries to or the death of any person, or for loss of or damage to property of others, resulting from the negligent operation or maintenance of aircraft under such certificate or such special operating authorization.

(2) In order to protect travelers and shippers by aircraft operated by *supplemental air carriers,* the Board may require any *supplemental air carrier* to file a performance bond or equivalent security arrangement, in such amount and upon such terms as the Board shall prescribe, to be conditioned upon such *supplemental air carrier's* making appropriate compensation to such travelers and shippers, as prescribed by the Board, for failure on the part of such carrier to perform air transportation services in accordance with agreements therefor.

(3) If any service authorized by a certificate to engage in supplemental air transportation is not performed to the minimum extent prescribed by the Board, it may by order, entered after notice and hearing, direct that such certificate shall thereupon cease to be effective to the extent of such service.

(4) The requirement that each applicant for a certificate to engage in supplemental air transportation must be found to be fit, willing, and able properly to perform the transportation covered by his application and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board under this chapter, shall be a continuing requirement applicable to each *supplemental air carrier* with respect to the

the Board of Port Commissioners, and the Oakland Chamber of Commerce) urge us to eliminate this "anomaly" by construing these provisions to apply only to supplemental *operations* rather than to all services performed by an air carrier holding supplemental authority. The Oakland parties support their position by analogy to *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601 (D.C.Cir. 1976), in which this court held that a cable television operator can be a common carrier with respect to some activities, but a non-common carrier with respect to others.

We find it unnecessary to pass on the validity of the Oakland parties' interpretation, since we fail to see why the provisions in question raise an anomaly at all. Of course, if the Oakland parties are correct, a supplemental carrier holding route authori-

ty would be covered by the 1962 amendments in its supplemental capacity, but not in its route capacity.[7] Being "covered and not covered" in this manner would make perfectly good sense. But even if the references to "supplemental air carriers" were construed to cover all activities by an air carrier holding supplemental authority, these provisions would hardly be irrational. It would not be unreasonable for Congress to deny benefits and impose requirements on supplemental air carriers operating scheduled routes, while granting benefits and waiving requirements for carriers holding only scheduled authority, if Congress felt such a distinction were required to ensure that supplemental air carriers would fully carry out their responsibilities. Thus, we leave it to the Board, in the first instance, to select the interpretation which will best fulfill the purposes of the Act.[8]

transportation authorized by, and currently furnished or proposed to be furnished under, *such carrier's* certificate. The Board shall by order, entered after notice and hearing, modify, suspend, or revoke such certificate, in whole or in part, for failure of *such carrier* (A) to comply with the continuing requirement that *such carrier* be so fit, willing, and able, or (B) to file such reports as the Board *may deem necessary* to determine whether *such carrier* is so fit, willing, and able.

(5) In any case in which the Board determines the failure of a *supplemental air carrier* to comply with the provisions of paragraph (1), (3), or (4) of this subsection, or regulations or orders of the Board thereunder, requires, in the interest of the rights, welfare, or safety of the public, immediate suspension of *such carrier's* certificate, the Board shall suspend such certificate, in whole or in part, without notice or hearing, for not more than thirty days. * * *

49 U.S.C. § 1371(n) (1970) (emphasis supplied). Section 406(b), as amended in 1962, provides in relevant part:

(b) In fixing and determining fair and reasonable rates of compensation under this section, the Board, considering the conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of service. In determining the rate in each case, the Board shall take into consideration, among other factors, (1) the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the

transportation of mail; (2) such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and (3) the need of each such air carrier (*other than a supplemental air carrier*) for compensation for the transportation of mail sufficient to insure the performance of such service, and, together with all other revenue of the air carrier, *to enable such air carrier* under honest, economical, and efficient management, to maintain and continue the development of air transportation to the extent and of the character and quality required for the commerce of the United States, the United States Postal Service, and the national defense. * * *

49 U.S.C. § 1376(b) (1970) (emphasis added).

7. With respect to section 401(e)(6), any eligibility for benefits would flow from the carrier's route authority.

8. Just as we do not think it sufficient to resolve the issue in this case by looking to the "plain meaning" of section 401(g), we do not think the Board should be content to rest on the "plain meaning" of the term "supplemental air carrier" in sections 401(e)(6), 401(n), and 406(b). The various provisions of the statute should be interpreted so as to effectuate their underlying purposes, with due regard of course for their language as evidence of those purposes. Since World is apparently willing to waive any charter rights under 401(e)(6) and any right to subsidy under 406(b), these questions of interpretation may never arise. If and when they do arise, however, we leave open the possibility that the term "supplemental air carrier" may

The Board also found the prospect of a supplemental carrier acquiring full route authority under section 401(d)(1) or (2) unreasonable in light of the carefully limited circumstances in which individually ticketed service may be obtained as part of a supplemental license.[9]  Section 417 of the Act, added by the 1962 amendments, allows supplemental carriers to seek special operating authorizations to engage in *temporary* route service, when the capacity provided by the regular carriers on a given route is temporarily insufficient.[10]  Again, however, we are unable to see the alleged inconsistency.  It is one thing to limit the incidents which flow directly from supplemental certification; it is another thing entirely to eliminate the possibility of acquiring an additional bundle of rights, upon satisfaction of the requirements for a different type of certificate.

### III

We think the legislative history of section 417 supports our conclusion that Congress was merely concerned with delimiting the rights which attach to supplemental certification, and did not intend to preclude applications for regular route authority.  The bill originally passed by the Senate contained a provision allowing the Board to grant permanent scheduled authority—in addition to special operating authorizations under section 417—as part of a supplemental license, but this authority would have been subject to Board controls on the number of flights permitted during any given time period.  *See* S.Rep. No. 688, 87th Cong., 1st Sess. at 1–2, 14–15 (1961), U.S. Code Cong. & Admin.News 1962, p. 1844. The House Commerce Committee deleted the additional Senate provision and confined the supplementals' individually ticketed authority to that arising under section 417.  *See* H.Rep. No. 1177, 87th Cong., 1st Sess. at 11–12 (1961).  The Conference Committee adopted the House version with regard to this issue.  H.Rep. No. 1950, 87th Cong., 2d Sess., at 14 (1962), U.S.Code Cong. & Admin.News 1962, p. 1865.

The Board read the repudiation of the Senate provision as clear evidence of a congressional intent to preclude supplemental air carriers from obtaining scheduled route authority.  We think the House Commit-

---

properly be given different interpretations with respect to different sections.

**9.** The Board stated:
> .   .   .   if, as World concedes, Congress has prohibited "supplemental air carriers" from engaging in scheduled service under the supplemental license, it makes little sense to conclude that Congress has, nevertheless, permitted the supplementals to engage in scheduled air transportation by acquiring a route certificate.

Docket 27693, *supra*, at 11.  Litigation over the proper definition of "charter trips" has also focused on the congressional purpose to prevent supplemental carriers from engaging in individually ticketed service pursuant to their supplemental certificates.  *See* note 2 *supra*.

**10.**  Section 417 provides in relevant part:
> (a) If the Board finds upon an investigation conducted on its own initiative or upon request of an air carrier—
> (1) that the capacity for air transportation being offered by the holder of a certificate of public convenience and necessity between particular points in the United States is, or will be, temporarily insufficient to meet the requirements of the public or the postal service; or
> (2) that there is a temporary requirement for air transportation between two points, one or both of which is not regularly served by any air carrier;  and
> (3) that any supplemental air carrier can provide the additional service temporarily required in the public interest;
> the Board may issue to such supplemental air carrier a special operating authorization to engage in air transportation between such points.
> (b) A special operating authorization issued under this section—
> (1) shall contain such limitations or requirements as to frequency of service, size or type of equipment, or otherwise, as will assure that the service so authorized will alleviate the insufficiency which otherwise would exist, without significant diversion of traffic from the holders of certificates for the route;
> (2) shall be valid for not more than thirty days and may be extended for additional periods aggregating not more than sixty days;  and
> (3) shall not be deemed a license within the meaning of section 1008(b) of Title 5.

49 U.S.C. § 1387(a), (b) (1970).

tee's report makes clear, however, that the Senate provision was rejected out of a desire to preserve the basic regulatory framework of sections 401(d)(1) and (2). The House Committee relied explicitly on this court's decision in *United Air Lines, Inc. v. CAB, supra,* 278 F.2d 446, which had rejected, as contrary to the pre-1962 version of the Federal Aviation Act, numerical limitations on individually ticketed flights offered by supplemental carriers. *See id.* at 448–49. The Committee Report called this holding "fundamental" to the "regulatory philosophy" of the Act, stating that the Board's responsibility is to determine the general need for competition, not to assign specific numbers of flights to particular carriers. While "supplemental" route authority might pose a danger of unfair competition to regular carriers, full route authority acquired upon satisfaction of the 401(d)(1) or (2) prerequisites would, by definition, constitute fair competition.[11] Indeed, the Committee Report, in approving section 417 as a measure necessary to address temporary shortages of route capacity, stated:

> It is the committee's view that the granting of such temporary special operating authority by the Board should not be regarded as constituting any vested right or interest in the route by the carrier so authorized. If the insufficiency of capacity is a chronic problem over the particular route, and can be solved only by an additional carrier, the solution should be in permanent or temporary certification under section 401(d)(1) or (2) of existing law.

H.Rep. No. 1177, *supra,* at 12.

Whether considered singly or together, we cannot agree that the "plain implication" of the 1962 provisions is that Congress intended to create two mutually exclusive classes of air carriers. If this intention were really clear from the structure of the legislation, it would be difficult to explain why Congress felt compelled to include the express prohibition in section 401(d)(3) against acquisition of supplemental authority by a regular carrier. At the same time, the Board cannot rely on this express limitation in section 401(d)(3) as a basis for inferring its converse. As the Board concedes, *see* Docket 27693, *supra,* at 4, the restriction on regular carriers was inserted for a specific purpose, to protect the infant supplemental industry from possible domi-

---

11. The House Report provided in relevant part:

The scheduled carriers opposed any authority for supplementals to conduct individually ticketed operations as a serious threat to the health and prosperity of the scheduled industry, citing the poor earnings of the scheduled carriers for the past 5 years. A witness for the industry testified that in 1960 the 12 domestic trunklines had a net profit of $1,188,000 on gross operating revenues of almost $12 billion.

*Regulatory concepts of existing law*

The so-called certificates issued by the Civil Aeronautics Board to the supplementals were illegal. This illegality was not a mere technical infraction of the act. It was fundamental. The 10-flight individually ticketed grant violated basic principles of the economic regulatory philosophy of the Federal Aviation Act of 1958. Thus, the act recognizes that a carrier's ability to provide good public service should not be hampered by artificial limits on the number of regular schedules for ticketed traffic it can operate over its routes. The act rejects the restrictionist philosophy prevalent in some foreign countries that a governmental bureau should divide the market by assigning each carrier an allowed number of flights.

The committee has carefully considered the testimony and all available evidence and failed to find any sound reason why these fundamental principles of the act should be changed. From the standpoint of good public service, and from the standpoint of opportunity for each carrier to compete and develop its business, any air carrier certificated to operate individually ticketed service over a route should be able to do so without CAB-imposed limitations on the frequency of service. *If there is room for competition over a route, the CAB has authority in section 401 to certificate additional carriers. If there is not room for such competition, the Board should not be free to avoid the consequences of competition by limiting the volume of service to be provided by one, some or all of the carriers in the market.* Moreover, the committee does not consider it either feasible or desirable to authorize an air transport system in which the amount of service is half unregulated.

H.Rep. No. 1177, *supra,* at 11–12 (emphasis supplied).

nation by the powerful route carriers. Although the legislative history of the provision is rather thin, it fully supports this interpretation.[12]

The Board argues that Congress could not have meant the possibility of holding both regular and supplemental authority to turn on which type of certificate is obtained first. In its written opinion the Board reasoned:

> . . . if a prospective new entrant into air transportation filed simultaneous applications for route and supplemental certificates it could not be awarded both certificates if the route case were decided first because it would then be a scheduled carrier seeking a supplemental certificate—the very situation which World concedes the language of the Act prevents. On the other hand, again pursuant to World's views, the Board could grant the new entrant both certificates if the Board decided the supplemental cer-

tificate case before the route case. Frankly, we think that it is inconceivable that Congress could have meant that such arbitrary procedural circumstances should control the fundamental role that a carrier should play in the air transportation system.

Docket 27693, *supra*, at 7. The simple answer is that the Board should not arbitrarily determine which application to consider first, but should exercise its discretion so as to carry out the limited statutory purpose of protecting supplemental carriers from domination by regular carriers. We presume, for example, that a prospective new entrant would have a strong case in favor of having the supplemental application considered first, if the route authority at stake would not be significant enough to raise a danger of undue domination. Of course, if the route application were filed subsequent to award of the supplemental certificate, then the problem would not arise.[13] And,

---

**12.** The companion bills originally introduced in the House and the Senate, H.R. 7318 and S. 1969 respectively, did not contain any restriction on who could apply for supplemental certification. Language precluding applications by regular carriers for supplemental certificates apparently was inserted by the Senate Commerce Committee staff following the close of hearings on S. 1969 before the Aviation Subcommittee. *See* Committee Print of S. 1969, 87th Cong., 1st Sess. (July 10, 1961). In reporting the bill out to the full Senate, the Commerce Committee amended the earlier Committee Print to include the precise restrictive language now appearing in section 401(d)(3). *See* S.Rep. No. 688, *supra*, at 2.

The most directly relevant materials appearing in the hearings before the Aviation Subcommittee are the following·exchanges, first, between Senator Monroney and the Chairman of the CAB, Alan S. Boyd, and, second, between Senator Cotton and Mr. Boyd:

> *Senator Monroney.* Assuming enactment of S. 1969, does the Board contemplate consolidating into a single proceeding applications for regular and supplemental certificates? *Mr. Boyd.* No sir. That, as I understand it, would be legally possible, but we have no contemplation of that.

Hearings on S. 1969 Before the Aviation Subcomm. of the Senate Committee on Commerce, 87th Cong., 1st Sess. 29 (June 26–30, 1961).

> *Senator Cotton.* Under this bill [S. 1969] could a regularly certificated carrier also apply for a certificate as a supplemental carrier?

> *Mr. Boyd.* Yes, sir.
> *Senator Cotton.* Is it conceivable that the CAB would ever permit a regularly certificated carrier to have a certificate as a supplemental carrier as well?
> *Mr. Boyd.* I can only say that the Board has no contemplation of such a possibility, Senator Cotton.
> *Senator Cotton.* At present, a carrier could not form a separate corporation which would be in a sense controlled by it, to attempt to go into the supplemental carrier business. Is that correct?
> *Mr. Boyd.* Absolutely. We have very good safeguards.
> *Senator Cotton.* And that is legally provided against, and is the subject of checking constantly by the CAB?
> *Mr. Boyd.* Yes, sir.

*Id.* at 33. In addition, Senator Sparkman appeared as a witness and expressed his feeling "that this committee should make every effort to protect the supplemental airlines, the true small businesses of civil aviation." *Id.* at 122.

**13.** World argues that if it were to acquire route authority it could apply for renewal of its temporary supplemental authority under section 401(g), 49 U.S.C. § 1371(g) (1970), and would not be constrained by the restriction in section 401(d)(3). It is unnecessary to decide this question, given the posture of the case before us. We note, however, that World's permanent supplemental authority would not be affected by the 401(d)(3) restriction.

in any event, the supplemental carrier will have to convince the Board that its supplemental responsibilities will not be neglected if it acquires route authority.

We reverse the order of the Board dismissing petitioner's application, and remand for proceedings not inconsistent with this opinion.

*It is so ordered.*